# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF MISSISSIPPI
# EASTERN DIVISION

**FRANK M. BATES**                                                                                 **PLAINTIFF**

**VERSUS**                                                             **CIVIL ACTION NO. 1:04CV389**

**THE CITY OF AMORY**                                                       **DEFENDANT**

## MEMORANDUM OPINION

This cause is before the Court on the defendant's Motion for Summary Judgment [22-1]. The Court, having reviewed the motion, the response, the briefs of the parties, the authorities cited and being otherwise fully advised in the premises, finds as follows, to-wit:

### FACTUAL BACKGROUND

Frank Bates, an African American, began working as a fireman and ambulance driver for the City of Amory in 1977. While employed with the City, Bates primarily worked the night shift from 10 p.m. to 6 a.m.[1] During the day, from approximately 1979 until 1991, Bates also worked as a custodian and bus driver for the Amory school system. In addition to his public employment, Bates also worked as a handyman and a preacher; he also owns rental property and a cemetery.

On March 8, 1984, Bates enrolled in the Public Employees Retirement System (PERS) through the City of Amory and began making payroll contributions.[2] As a participant in PERS,

---

[1] Bates also worked 12 hour shifts toward the end of his employment; those shifts ran from 6:00 p.m. to 6:00 a.m.

[2] Bates enrolled in PERS through his employment with the school system as well. Therefore, although he did not enroll in PERS through the Amory Fire Department until 1984, his years of credited service date back to his initial employment with the school system.

Bates received an annual statement from PERS showing his contributions and years of credited service. His 2003 annual statement projected twenty-five (25) years of credited service as of July 1, 2004. Thereafter, Bates approached Suzanne Mobley, the Amory City Clerk, and asked her to check on his retirement, partly because he felt he was entitled to more years of credited service than were reported on his PERS statement. He was interested in obtaining a benefits estimate based on his years of service.

In the summer of 2003, Amory Fire Chief Jimmy Bost heard from other firemen that Bates planned to retire. Chief Bost approached Bates and asked him about his plans. Bates advised Chief Bost that he was merely checking into retirement. On a subsequent occasion, Chief Bost asked Bates if he had heard anything regarding his retirement inasmuch as he planned to make some changes in the department and he needed to know Bates' plans. Bates replied that he had not learned anything more from Mobley. Bost inquired of Bates regarding his retirement plans on a third occasion in February 2004[3]; at that time, Bates informed Chief Bost that he was not going to retire. The Fire Chief replied, "No problem."

In February 2004 Bates, with the assistance of his wife, completed a PERS Form 9A, Application for Retirement Benefits, supplied to him by Mobley in response to his request for information. He signed and dated the form on February 12, 2004. Mobley completed the employer portion of the form on February 21, 2004 and submitted it to PERS on Bates' behalf. Mobley knew

---

[3] Chief Bost testified by deposition that his interest in Bates' retirement plans stemmed from his desire to move all full-time department employees to a 24 hour shift schedule; nonetheless, he was willing to delay the change to accommodate Bates if his retirement was imminent.

at the time she submitted the application that Bates did not plan to retire.[4]

A few weeks later, Bates received a letter from PERS acknowledging receipt of his retirement application; the letter enclosed a "Final Estimate of Benefits" and additional forms to be completed and returned to PERS.[5] The benefits estimate projected a retirement date of July 1, 2004 with twenty-five (25) years of credited service. Upon receipt of the benefits estimate, Bates' spouse contacted Mobley and asked her to contact PERS to obtain clarification regarding Bates' years of credited service. After doing so, Mobley called Mrs. Bates and explained how the service years were calculated.

On June 28, 2004, the Fire Department held a training session. During the course of the meeting, Chief Bost discussed departmental changes resulting from the department's decision to discontinue its ambulance service effective August 1, 2004. Chief Bost announced his decision to move Bates to Station 1 to work a twenty-four (24) hour shift along with the other full-time firemen at that time.[6]

The following day Bates met with Chief Bost about the changes announced at the training session and asked if there was any alternative to working the twenty-four (24) hour shift.[7] Chief Bost

---

[4] PERS previously had provided Mobley with Form 9A in response to similar employee requests to check on retirement benefits.

[5] The City Clerk's office does not receive forms from PERS which are necessary to finalize an employee's retirement. Those forms are mailed directly to the employee by PERS.

[6] Bost began moving all of the full-time certified firemen to twenty-four (24) hour shifts long before June 2004.

[7] Bates testified at his deposition that he had no problem with working the twenty-four (24) hour shift; he was merely checking on alternatives because he was concerned about whether he would have sufficient time to attend to his other business interests while working a twenty-four (24) hour shift.

3

then gave Bates an option between the twenty-four (24) hour shift or working Monday through Friday from 6:00 a.m. to 2:00 p.m.

After his conversation with Chief Bost, Bates decided to check with PERS on his retirement situation again. He did so on June 30, 2004. At that time, the PERS representative informed him that he was already retired. Bates protested that he had not submitted his papers; the PERS representative told him that Mobley submitted the paperwork and that PERS was preparing to send his first retirement check. She also stressed the fact that Bates could not work another day or he would be ineligible for a lump sum COLA check.[8]

After concluding his conversation with the PERS representative, Bates went to see Mobley at City Hall. He told Mobley that, according to PERS, he was retired. Mobley assured Bates there must be a mistake; Mobley's contact with PERS again confirmed that if Bates worked beyond June 30, 2004 he would have to wait another full fiscal year after retirement before he would be eligible to receive a COLA check. Mobley instructed Bates to explain the situation to Chief Bost and to ask for his time sheet so she could prepare his final paycheck.

Based on Mobley's explanation that his working after June 30, 2004 would mess up his retirement,[9] Bates sought out Chief Bost and told him he could not work after June 30th. Chief Bost gave Bates his time sheet as requested. At no time during the brief conversation did Bates tell Chief

---

[8] The COLA, also referred to as the 13th month check, is an annual benefit adjustment. A retiree can elect to receive it in a lump sum or spread out over six months or monthly intervals.

[9] Chief Bost contacted Bates at home on July 1, 2004 and asked him why he had not reported for duty the night before. Bates explained that Mobley told him he could not work anymore. Chief Bost complained briefly that Bates left the department in a bind by failing to give notice of his retirement. At his deposition, Bates explained he had no plans to retire, "but when she told me that, I just did what she said."

4

Bost he did not want to retire.

Bates returned the time sheet to Mobley; when he did so, he commented: "What I can't understand, how can I be retired, and they going to give me retirement check, and I'm supposed to be working?" Mobley replied, "You can't work no more, the City can't pay you." Bates then said, "Okay."

Following his retirement, Bates returned to Mobley's office to complete some additional retirement forms. Mobley reviewed the forms for accuracy and Bates left the forms with her. One of the forms was Bates' "Final Application for Retirement Benefits." By letter dated July 9, 2004, PERS provided Bates with a beneficiary form for him to complete and return. Finally, PERS notified Bates by letter dated July 20, 2004 that his application for retirement benefits had been received and processed, and that his first check would be mailed on July 30, 2004.

Bates filed an EEOC complaint on August 9, 2004. His charge alleged discrimination based on race and age; in the body of his charge he stated he was forced to retire and that a young white male replaced him. After receiving a Right to Sue letter from the EEOC, Bates filed suit against the City of Amory on December 14, 2004. He seeks recovery under Title VII, 42 U.S.C. §§ 1981 and 1983, and the ADEA. The City answered, denying all liability. After adequate opportunity for discovery, the municipality filed its Motion for Summary Judgment seeking dismissal of all claims. The motion has been fully briefed and is ripe for decision.

## STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure authorizes summary judgment where "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine dispute as to any material fact and that the moving party is

entitled to judgment as a matter of law. Celotex Corporation v. Catrett, 477 U.S. 317, 322, 91 L.Ed.2d 265, 106 S. Ct. 2548 (1986). The existence of a material question of fact is itself a question of law that the district court is bound to consider before granting summary judgment. John v. State of La. (Bd. Of T. for State C. & U., 757 F.2d 698, 712 (5th Cir. 1985).

A judge's function at the summary judgment stage is not himself to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 91 L.Ed.2d 202, 106 S. Ct. 2505 (1986).

Although Rule 56 is peculiarly adapted to the disposition of legal questions, it is not limited to that role. Professional Managers, Inc. v. Fawer, Brian, Hardy & Zatzkis, 799 F.2d 218, 222 (5th Cir. 1986). "The mere existence of a disputed factual issue, therefore, does not foreclose summary judgment. The dispute must be genuine, and the facts must be material." Id. "With regard to 'materiality', only those disputes over facts that might affect the outcome of the lawsuit under the governing substantive law will preclude summary judgment. Phillips Oil Company, v. OKC Corporation, 812 F.2d 265, 272 95th Cir. 1987). Where "the summary judgment evidence establishes that one of the essential elements of the plaintiff's cause of action does not exist as a matter of law, . . . all other contested issues of fact are rendered immaterial. See Celotex, 477 U.S. at 323, 106 S. Ct. at 2552. Topalian v. Ehrman, 954 F.2d 1125, 1138 (5th Cir. 1992).

In making its determinations of fact on a motion for summary judgment, the Court must view the evidence submitted by the parties in a light most favorable to the non-moving party. McPherson

v. Rankin, 736 F.2d 175, 178 (5th Cir. 1984).

The moving party has the duty to demonstrate the lack of a genuine issue of material fact and the appropriateness of judgment as a matter of law to prevail on his motion. Union Planters Nat. Leasing v. Woods, 687 F.2d 117 (5th Cir. 1982). The movant accomplishes this by informing the court of the basis of its motion, and by identifying portions of the record which highlight the absence of genuine factual issues. Topalian, 954 F.2d at 1131.

"Rule 56 contemplates a shifting burden: the nonmovant is under no obligation to respond unless the movant discharges [its] initial burden of demonstrating [entitlement to summary judgment]." John, 757 F.2d at 708. "Summary judgment cannot be supported solely on the ground that [plaintiff] failed to respond to defendants' motion for summary judgment, " even in light of a Local Rule of the court mandating such for failure to respond to an opposed motion. Id. at 709.

However, once a properly supported motion for summary judgment is presented, the nonmoving party must rebut with "significant probative" evidence. Ferguson v. National Broadcasting Co., Inc., 584 F.2d 111, 114 (5th Cir. 1978). In other words, "the nonmoving litigant is required to bring forward 'significant probative evidence' demonstrating the existence of a triable issue of fact." In Re Municipal Bond Reporting Antitrust Lit., 672 F.2d 436, 440 (5th Cir. 1982). To defend against a proper summary judgment motion, one may not rely on mere denial of material facts nor on unsworn allegations in the pleadings or arguments and assertions in briefs or legal memoranda. The nonmoving party's response, by affidavit or otherwise, must set forth specific facts showing that there is a genuine issue for trial. Rule 56(e), Fed. R. Civ. P. See also Union Planters Nat. Leasing v. Woods, 687 F.2d at 119.

While generally "[t]he burden to discover a genuine issue of fact is not on [the] court, (Topalian, 954 F.2d at 1137), "Rule 56 does not distinguish between documents merely filed and those singled out by counsel for special attention–the court must consider both before granting a summary judgment." John, 757 F.2d at 712, quoting Keiser v. Coliseum Properties, Inc., 614 F.2d 406, 410 (5th Cir. 1980).

LEGAL ANALYSIS

I.  ADEA Claim

Plaintiff claims he was forced into retirement because of his age in violation of the ADEA. In order to establish a prima facie case of age discrimination, the plaintiff must establish:

1) He is a member of the protected class of individuals over forty years of age;

2) He was qualified for the position he held;

3) He was subjected to an adverse employment action; and

4) He was replaced by a younger person or otherwise discharged because of his age.

Bauer v. Albemarle Corp., 169 F.3d 962, 966 (5th Cir. 1999).

Once a plaintiff establishes a prima facie case, a presumption of discrimination arises and the burden shifts to the defendant to assert some legitimate, non-discriminatory reason for the challenged employment decision. Pratt v. City of Houston, Texas, 247 F.3d 601, 606 (5th Cir. 2001). If the defendant makes the required showing, the earlier presumption of discrimination falls from the case and the burden shifts back to the plaintiff to demonstrate that the articulated basis for the employment action was a mere pretext for discrimination. Auguster v. Vermilion Parish School Board, 249 F.3d 400, 402 (5th Cir. 2001). The plaintiff at all times retains the ultimate burden of persuading the fact finder that the employment decision was the result of intentional discrimination.

Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 253, (1981).

The defendant concedes for purposes of the summary judgment motion that Bates can establish elements one, two and four of his prima facie case. However, the City categorically denies that there is any evidence tending to establish the required third element of his case, e.g., an adverse employment action. Plaintiff contends that his retirement constitutes an adverse employment action inasmuch as it occurred at the behest of Chief Bost and not as a result of a volitional act on his part.

The problem with plaintiff's position is that there is absolutely nothing in the record to support the conclusion that Chief Bost forced Bates to retire effective July 1, 2004. At best, the circumstances leading to plaintiff's retirement can only be construed as the result of failed communications between PERS and Bates, and Mobley and Bates regarding the intent behind Bates' June 30, 2004 inquiry into retirement benefits and what effect his continued employment after that date would have on his eligibility to receive a COLA check. Chief Bost knew nothing of plaintiff's impending retirement before Bates approached him on June 30, 2004 to ask for his time sheet. Bates did not explain to Chief Bost that he did not want to retire; he merely repeated what he'd learned from speaking with the PERS representative and Suzanne Mobley, e.g., that if he worked after June 30, 2004 it would "mess up his retirement." In literal terms, Bates summarized his conversation with Chief Bost as follows:

Q. When you went over, got the, –your–

A. –timesheet?

Q. –timesheet, did you tell the chief that you would not be in the next day because you couldn't work.

A. I told him that what Suzanne said, that told me.

9

> Q. Which was what?
>
> A. She told me that I couldn't work another day, and said that you can't work another day. If you work another day, the City can't pay you, so I replied to the chief that. And he didn't ask no questions, so I didn't volunteer, you know. I didn't know what was going on. He didn't ask me why or I didn't say anything.

Plaintiff's Exhibit 1 at p. 105-06.

In short, the evidence before the Court shows no involvement by Chief Bost in plaintiff's retirement. Absent such a showing, no reasonable trier of fact could conclude that Bates suffered an adverse employment action at the hands of his employer. Because plaintiff cannot demonstrate a genuine issue of material fact as to one of the required elements of his claim, the defendant is entitled to summary judgment on the ADEA claim.[10]

## II. Title VII Claim

Plaintiff also claims his alleged forced retirement was racially motivated. Title 42, section 2000e-2 forbids an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ." 42 U.S.C. § 2000e-2(a)(1). A plaintiff seeking to recover under Title VII must first demonstrate a prima facie case under McDonnell-Douglas Corporation. v. Green. 411 U.S. 792, 93 S. Ct. 1817, 36 L.Ed.2d 668 (1973).

---

[10] The City relies on this same mixup as its explanation for plaintiff's retirement. Accordingly, even assuming that plaintiff's retirement can be considered an adverse employment action for purposes of his prima facie case, plaintiff offered no evidence from which a reasonable trier of fact could conclude that Bates' sudden retirement was the result of age discrimination. The Court has scoured the record; none of the evidence adduced by plaintiff supports the theory that Chief Bost and the other firemen harassed Bates about retirement or that Chief Bost conspired with the City Clerk to force his retirement because of his age. Based on the record evidence and in the absence of any showing of discriminatory animus, plaintiff cannot make a showing of pretext sufficient to survive summary judgment.

A prima facie case consists of the following elements:

1. Membership in a protected class;

2. The claimant is qualified for the position;

3. The claimant suffered an adverse employment action;

4. The position remained open or was filled by a member not of the protected class.

McDonnell Douglas, 411 U.S. at 802. If a plaintiff establishes a prima facie case, the burden then shifts to the defendant employer to articulate a legitimate, nondiscriminatory reason for the employment decision. Id. at 802-03. Once the employer does so, the burden then shifts back to the plaintiff to produce evidence tending to establish that the reason advanced in support of the decision is a mere pretext for discrimination. Id. at 804, 807. A plaintiff may do so by producing evidence of discriminatory motive or by showing the employer's "basis" for the adverse employment decision is unworthy of belief and that, instead, the true reason was unlawful discrimination. St. Mary's Honor Center v. Hicks, 509 U.S. 502, 516-519 (1993). Again, plaintiff retains the ultimate burden of persuading the fact finder that the employment decision was due to intentional discrimination. Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 253, (1981).

Bates' race discrimination claim under Title VII fails for the same reason as his ADEA claim–he cannot establish a genuine issue of fact as to whether he was subjected to an adverse employment action by the City. Therefore, for precisely the same reasons articulated in subsection I. supra, defendant is entitled to summary judgment on plaintiff's Title VII claim.[11]

---

[11] Bates is also incapable of adducing sufficient evidence to demonstrate a triable issue of fact on the matter of pretext. See note 10, supra. The evidence to support a showing of racial animus for the claimed adverse employment action is even more scant than for plaintiff's age discrimination claim.

III. § 1983 Claim

The same operative facts support plaintiff's § 1983 claim. Because the analysis employed for racial discrimination under § 1983 is the same as that utilized under Title VII, the Court finds that judgment as a matter of law is appropriate on Bates' § 1983 claim as well.[12]

CONCLUSION

Based on the foregoing facts and analysis, the Court finds that the defendant's motion is well-taken and should be granted. A judgment will issue accordingly.

This, the 15th day of September, 2006.

/s/ W. Allen Pepper, Jr.
W. ALLEN PEPPER, JR.
UNITED STATES DISTRICT JUDGE

---

[12] Bates has no independent remedy for race discrimination under 42 U.S.C. § 1981. Jett v. Dallas Independent School District, 491 U.S. 701, 731, 109 S. Ct. 2702, 105 L.Ed.2d 598 (1989) (holding that plaintiffs must assert a cause of action against state actors under 42 U.S.C. § 1983 to remedy alleged violations of civil rights under § 1981). See also Oden v. Oktibbeha County, Mississippi, 246 F.3d 458, 463-64 (5th Cir. 2001).